Ronald JACKSON, Appellant,

v.

**GOLDEN EAGLE ARCHERY, INC., et al., Appellee.**

No. 09–96–302 CV.

Court of Appeals of Texas, Beaumont.

Submitted Nov. 3, 2000.

Decided Nov. 16, 2000.

David B. Gaultney, John Cash Smith, Mehaffy & Weber, P.C., Beaumont, George Barron, Orange, for appellant.

Jacqueline M. Stroh, Lipscomb Norvell, Jr., Benckenstein, Norvell & Nathan, L.L.P., Beaumont, for appellee.

Before WALKER, C.J., BURGESS and STOVER, JJ.

## OPINION

STOVER, Justice.

In this products liability action against the manufacturer of a compound bow, Ronald Jackson moved for a new trial alleging juror misconduct, along with other

grounds. Holding that Tex.R.Civ.P. 327(b) denied Jackson his constitutional right to a fair and impartial jury trial, this court reversed and remanded for a new trial. *See Jackson v. Golden Eagle Archery, Inc.,* 974 S.W.2d 952 (Tex.App. Beaumont 1998), *rev'd,* 24 S.W.3d 362 (Tex.2000). After granting appellee's petition for review, the Texas Supreme Court found the rule constitutional, concluded there was no jury misconduct, reversed this court's judgment, and remanded for consideration of Jackson's other points of error. *See id.,* 24 S.W.3d at 372–375.

## BACKGROUND FACTS

After going bow hunting for deer with a friend, Ronald Jackson became interested in the sport and ultimately became a proficient bow hunter. He owned a variety of bows, including compound, right-handed, and left-handed bows, and had killed four or five deer with a compound bow. For Jackson's birthday in October 1991, his wife, Lisa, purchased a compound bow that had been manufactured by Golden Eagle Archery, Inc. (appellee). When she presented the bow to him, he drew the string back to demonstrate to a friend how he could shoot the bow without sights. During the demonstration, Jackson's hand slipped, the bow recoiled, and the cable guard on the bow struck him in the face. As a result of the accident, Jackson sustained fractures around his eye, a broken nose, a cut to his eyelid, and trauma to the eye itself. His initial hospital stay in October 1991 was ten (10) days. A month later, he was hospitalized two more days for surgery to repair the bone structure surrounding the orbit of his eye.

Medical records establish that immediately after the accident, Jackson was bleeding from the eye. Because of the fractures around the orbit of the eye, blood was draining into his sinuses and causing him to cough. He was in "a lot of pain." Initially taken to the emergency room in Orange, Texas, he was transferred by ambulance later that night to a hospital in a near-by town. Jackson's wife, Lisa, testified he was choking on blood and "throwing up a lot" in the ambulance. At the Beaumont hospital, a doctor sewed up the hole around the eye to stop the bleeding. During his ten day stay in the hospital, he was in significant pain and had swelling around the eye. Although Jackson had not experienced headaches on a regular basis until the accident, he testified at trial that he now has them 90 percent of the time and takes over the counter medication with him wherever he goes. Dr. Rowes, appellant's expert witness, testified that Jackson mentioned the headaches to him at an examination in 1993 and again in 1996, but indicated that Jackson said they were less in 1996 than what they had been before. From the time of the accident until the surgery on the eye, he experienced double vision, had to wear a patch over the eye, and was unable to drive or watch television without the patch. The surgery repaired his broken nose and the orbit around his eye and also corrected the double vision.

Dr. Rowes, appellant's expert witness, testified regarding his examinations of Jackson in 1993 and again in 1996. At trial, he agreed that the surgery achieved an "excellent result." The fractures around the eye healed, and after the surgery Jackson no longer experienced any double vision. Moreover, Dr. Rowes' tests indicated the visual acuity of the injured right eye is 20/25 minus one, and the left eye is 20/15 minus one. According to Dr. Rowes, *if Jackson is in good light, his vision in the right eye is actually 20/20.* In evaluating the visual acuity, Dr. Rowes characterized Jackson's vision as a "little loss on the right eye," as compared to the left, with "some distortion in the right eye on central vision." Dr. Rowes agreed with appellee's attorney's characterization of Jackson's near vision as being "pretty good."

At trial, Dr. Rowes presented graph-type exhibits and certain transparencies depicting the visual field in each eye. The

transparencies purport to give an accurate representation of what Jackson is able to see out of the injured eye. In his left eye, the visual field reveals a normal black or blind spot (which everyone has) where the optic nerve is located; however, the visual field in the right eye revealed a "bigger blind spot." The threshold visual field of the right eye exhibits a larger black area in the lower quadrant. Although Dr. Rowes indicated Jackson is not totally blind in the right lower quadrant of the injured eye, he stated Jackson has very little vision there. Looking straight ahead, Jackson still has more than half of the vision in his right eye. Looking down in the left eye, however, Jackson has significant loss.

In addition to the visual field problems, Dr. Rowes also testified to other deficiencies associated with the right eye. He described a slight, non-cosmetic misalignment of the eye that contributes to problems with depth perception and to Jackson's need to cover the right eye when using a cutting torch. Because of the trauma to the eye, Jackson also has a fixed pupil in the right eye. The significance of a fixed pupil is that it can "give you blurred vision and glare" and can make a person more near-sighted. As a result of his eye deficiencies, Jackson has trouble doing close-up or detailed work.

In summary, Dr. Rowes indicated his examinations of Jackson revealed four permanent problems with Jackson's right eye: the visual field problem, fixed pupil problem, misalignment of his eyes, and the blurred vision and decreased depth perception. As far as future problems, Dr. Rowes pointed out that blunt trauma injuries to the eye give rise to a greater risk of cataract formation and a condition called "angle recession glaucoma." Rowes also indicated that, although most people are at risk for glaucoma and cataracts as they age, Jackson is at higher risk in the right eye. Importantly, Dr. Rowes also testified that Jackson does not need glasses, none have been prescribed, and his optic nerve function is normal.

The record also reveals that Jackson has continued to work five days a week after his release to return to work in December 1991. James Moe, his job supervisor, testified Jackson is a pipefitter who also has done "torch work."[1] Moe indicated that, with age, Jackson would probably have gotten a lot better at torch work. Since the accident, Moe still calls upon Jackson to do "burning off and on," and, in Moe's estimation, Jackson handles the burning well enough "to where he [can] get by." On cross examination, Moe related that Jackson has been a good worker after the accident and that he approves of the quality of Jackson's "burning." In evaluating Jackson's torch work, however, Moe rated him a seven or eight before the accident and a four or five after the accident.

Lisa Jackson described the various ways the injury has affected her husband. He is self-conscious about the appearance of his eye, which has a "baggy place" or "fatty tissue" that has settled underneath the eye. He feels he looks ugly and does not want to have his picture taken. Before the accident, Jackson "could beat everybody" at pool; now, according to Lisa, she can beat him. No longer able to play at the level he once could, Jackson lost interest in the game and sold the pool table. Although Jackson still goes hunting some, Lisa testified he does not hunt as much as he once did. In addition, Lisa described how he trips up a lot and hits his right boot on objects; the upshot is that he has to replace his steel-toed boots more often. Jackson's testimony reiterated much of Lisa's testimony regarding his pain and impairment.

## JURY FINDINGS

After considering all the evidence, the jury found (a) there was a defect in Golden

---

1. The record does not indicate what is meant by "torch work." Apparently, it involves on-site fabrication work with pipes.

Eagle's marketing of the bow and (b) the marketing defect was a producing cause of the injury.[2] The jury also found that Jackson himself was negligent and that his negligence proximately caused the injury. In apportioning the percentage of causation, the jury found Jackson 45 percent responsible and Golden Eagle 55 percent responsible.

## POINTS OF ERROR

In points of error one through five, Jackson contends the trial court should have granted his motion for new trial because of the inadequacy of the jury's damage award. Specifically, he directs us to the inadequacy of the jury's findings for (a) physical pain and mental anguish, (b) physical impairment because of loss of vision, and (c) disfigurement. He also urges the jury's zero damage award for "impairment other than loss of vision" is so against the great weight and preponderance of the evidence as to be manifestly unjust.

It is undisputed that Jackson suffered face and eye injuries requiring medical treatment costing in excess of $25,000; the jury awarded him damages for those expenses. Yet, as Jackson points out, the jury awarded him $0 damages for physical impairment *other than loss of vision* and only $2,500 for physical pain and mental anguish, $2,500 for physical impairment because of loss of vision, and $1,500 for disfigurement.

### Standard of Review

▮ We review complaints of improper damage awards for sufficiency of the evidence. *See Larson v. Cactus Utility Co.*, 730 S.W.2d 640, 641 (Tex.1987) (applying legal and factual sufficiency standards to review of damage awards). When we review a challenge that the jury finding is against the great weight and preponderance of the evidence, we consider all the evidence, including any evidence contrary

to the judgment. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). If the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, we set aside the finding. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). We are mindful of the fact that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex.1982). The jury may resolve conflicts and contradictions in the evidence by believing all, part, or none of a witness's testimony. *See Harker v. Coastal Engineering, Inc.*, 672 S.W.2d 517, 520 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.).

We consider first the jury's finding of $0 damages on the element of physical impairment other than loss of vision. Jackson first contends a jury cannot ignore the undisputed fact of injury and, furthermore, the "jury must award something for every element of damage resulting from an injury." *See Thomas v. Oil & Gas Bldg., Inc.*, 582 S.W.2d 873, 881 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Using that premise, he argues that the jury's award of $0 damages for physical impairment other than loss of vision is manifestly unjust and against the great weight and preponderance of the evidence, and that it is inadequate as a matter of law.

▮ To recover damages for physical impairment, a plaintiff must prove " 'that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated.' " *Blankenship v. Mirick*, 984 S.W.2d 771, 777 (Tex.App.—Waco 1999, pet. denied) (further citations omitted). As set out above, the jury awarded damages for impairment due to loss of vision, but

---

**2.** No one contested the liability finding against Golden Eagle; therefore, we need not

recite any of the evidence regarding the marketing defect of the bow.

awarded nothing for impairment other than loss of vision. In reviewing the jury's finding of $0, we look to the record for evidence that Jackson had impairment for "other than loss of vision" that extended beyond pain and suffering and loss of earning capacity.

Jackson's position is that the fracture injuries to the orbit of the eye, of necessity, require a finding of damages for such impairment. In support of his position, he directs us to *Robinson v. Minick,* 755 S.W.2d 890 (Tex.App.—Houston [1st Dist.] 1988, writ denied). There the jury awarded damages for past pain and mental anguish, loss of past earnings, past medical expenses, past physical disfigurement, and loss of future earning capacity. The jury, however, failed to award any damages for past physical impairment and future physical impairment. In reviewing the jury findings, the *Robinson* court found the $0 damage award for past physical impairment was against the great weight and preponderance of the evidence, but upheld the $0 damage award for future physical impairment because it found the evidence on that element to be speculative. The *Robinson* Court characterized the facial fractures, surgery, and lengthy hospitalization as being objective, undisputed evidence of injury and "indications of past physical impairment" that were "independently proved, and did not rely upon appellant's credibility." *Id.* at 893.

We find *Robinson* instructive and, in similar fashion, we apply the law to the facts herein. Like the plaintiff in *Robinson,* Jackson sustained multiple fractures to his face; four of the seven bones that make up the orbit of the eye were fractured. In addition, he sustained a ruptured sinus and a broken nose. Admitted to the hospital on October 5, 1991, he remained there for ten days until October 14, 1991. Upon discharge, he returned home to await the surgery scheduled on

November 12, 1991, in Houston. Thirty-seven days elapsed from the date of the accident (October 5, 1991) until the injuries to his face were repaired. (November 12, 1992). The headaches, which he and others indicated began almost immediately after the injury, continued through the years. Though there was testimony the headaches had lessened with the passage of time, there is also testimony that he continued to experience them even at the time of trial. Clearly, the record demonstrates impairment other than loss of vision for the multiple injuries to Jackson's face. There is nothing subjective or conflicting about the evidence of the broken bones around his eye, the broken nose, or ruptured sinus; moreover, the injuries are demonstrative of impairment beyond pain and suffering, loss of earning capacity, and loss of vision. We conclude the jury's finding of $0 damages for "impairment other than loss of vision" is so against the great weight and preponderance of the evidence as to be manifestly unjust. Consequently, we sustain issue four. Because our disposition of issue four requires a remand of the case for a new trial, we need not address the remaining points of error; even if appellant prevailed on those points of error, he would not be afforded any greater relief.

Because we have sustained issue four, and find the evidence factually insufficient to support the jury's finding of $0 damages for impairment other than loss of vision, we remand to the trial court for a new trial.

REVERSED AND REMANDED.