Ronald JACKSON, Appellant,

v.

GOLDEN EAGLE ARCHERY,
INC., Appellee.

No. 09–96–302 CV.

Court of Appeals of Texas,
Beaumont.

Submitted June 25, 2004.

Decided Aug. 12, 2004.

---

John Cash Smith, Bush, Lewis & Roebuck, PC, George Barron, Orange, David W. Holman & Keeling, PC, Houston, for appellant.

Lipscomb Norvell, Jr., Benckenstien, Norvell & Nathan, LLP, Beaumont, Jacqueline M. Stroh, Crofts & Callaway, PC, San Antonio, for appellee.

Before McKEITHEN, C.J., BURGESS and HILL *, JJ.

## OPINION ON REMAND

DON BURGESS, Justice.

### STATEMENT OF THE CASE

This is the third time this case has been before our court. In our first decision, we considered alleged juror misconduct and the constitutionality of Texas Rule of Civil Procedure 327(b) and Texas Rule of Evidence 606(b), both of which limit proof of juror misconduct. *See Jackson v. Golden Eagle Archery, Inc.*, 974 S.W.2d 952 (Tex. App.-Beaumont 1998) (*Jackson I*). We found Rule 327(b) unconstitutional and that jury misconduct had occurred. Accordingly, we reversed the judgment and remanded the cause for another trial.

On appeal, the Supreme Court of Texas held Rules 327(b) and 606(b) neither deprived litigants of a fair trial under the Texas Constitution nor failed to afford litigants due process, and there was not competent evidence of juror misconduct. *See Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362 (Tex.2000) (*Jackson II* ). The Texas Supreme Court remanded the case to this court to consider issues not previously addressed.

In our second decision, we held the jury's failure to award any damages for one category of non-economic damages was so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Jackson v. Golden Eagle Archery, Inc.,* 29 S.W.3d 925 (Tex. App.-Beaumont 2000) (*Jackson III* ). We again reversed the judgment and remanded the cause for another trial.

On appeal, the Supreme Court of Texas found we had failed to properly apply the standard of review set forth in *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986), and articulated a new standard for factual sufficiency review when evidence pertains to more than one category of damages. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757 (Tex.2003) (*Jackson IV* ). The Texas Supreme Court again remanded the case to this court, this time to conduct a factual sufficiency review under the new standard and in compliance with *Pool v. Ford Motor Co.*[1]

### STATEMENT OF FACTS

This appeal involves a personal injury suit. Ronald Jackson sustained injuries as a result of a bow accident occurring on October 5, 1991. Jackson's wife bought him a Golden Eagle compound bow from a Wal–Mart store. When Jackson drew back the string, the bow slipped out of his hand and a cable guard struck him in the right eye, causing severe injuries. Jack-

---

* The Honorable John Hill, sitting by assignment pursuant to Tex. Gov't Code Ann. § 74.003(b) (Vernon Supp.2004).

1. We note that as of the date of this opinion, the new standard set forth in *Jackson IV*, handed down September 11, 2003, has not been applied in any other case.

son sued Golden Eagle Archery, Inc., Coleman Company, Inc., and Wal–Mart, Inc. for negligence and products liability. The trial court dismissed the claims against Coleman and Wal–Mart, leaving Golden Eagle as the sole defendant.

The jury failed to find the bow was defectively designed but found there was a defect in Golden Eagle's marketing of the bow, which was a producing cause of the injury. The jury also found that Jackson himself was negligent and that his negligence proximately caused the injury. In apportioning the percentage of causation, the jury found Jackson forty-five percent responsible and Golden Eagle fifty-five percent responsible. The jury found Jackson's damages to be $25,393.10 for medical care, $2,500 for physical pain and mental anguish, $2,500 for loss of vision, $0 for physical impairment other than loss of vision, $1,500 for disfigurement, and $4,600 for loss of earnings in the past. The trial court entered judgment for $20,071.15, plus $6,664.72 in prejudgment interest and court costs.

In his appeal, Jackson raises five issues contesting the awards for the non-economic damages. The evidence relating to those damages is set forth below.

### EVIDENCE

Jason Todd Jackson was present at the time of the injury. Regarding the accident, Jason testified it "hit him in the eye. And I remember him falling—they caught him. He was about to go on his knees and the bow was on the ground and there was this piece come off of it and they rushed him in the house." Jason "... could see he was in pain then and they all just helped him in the house." Jackson was falling to the ground, and "was right on his knees." There "was blood everywhere.... There was blood on—it was Billy. It was on his truck, and it was on the porch. Where they had walked—there was a trail of it toward where they had led him in the house." Jason testified that Jackson has headaches, and that he is around welding a lot and the injured eye easily gets burned.

James Moe worked with Jackson at the time of the injury. Moe visited Jackson in the hospital and said "he looked pretty black. That thing had his face all swolled up. Like I said, what I could remember of it, he look pretty well bruised up." Jackson went back to work for Moe at Temple. Moe testified Jackson "was a good hand. He worked—he still works good." Moe was asked whether Jackson "burn[s] as good after being injured as he did before?" Moe said that before the injury "he done pretty good. I thought he done a good job." As for after the injury, Moe said, "I wouldn't say it was real good, you know. It was enough to where he could get by." Moe testified that before the injury, on a scale of 1 to 10, he would rate Jackson 7 or 8 as a burner. After the injury, he would probably say 4 to 5.

Billy Jackson Glass knew Ronald and Lisa Jackson and was at the Jackson home when the injury occurred. Glass did not see Jackson pull the bow string back but heard "a noise, like thud, a whop." It caught his attention and he looked back to Jackson. Jackson was in a half-crouched position, going to the ground. Glass and Cecil, Jackson's former brother-in-law, took Jackson into the kitchen. Glass said Jackson "was in bad shape. He had a wound to his head." Jackson had his hands over his face, and Glass saw the blood coming through his fingers. Glass did not actually see Jackson's wound until they got to the kitchen sink and Glass pulled his hand down. Glass said, "[h]is head was laid open.... Right above his eye." Glass said it was a bad cut and they could not stop the bleeding. They took

Jackson to Baptist Hospital in Orange; on the way, Jackson was incoherent, coughing a lot, bleeding a lot, and experiencing nausea. Glass described Jackson at that time as, "[b]lack, blue, his face swollen, a lot of blood, hurting." The wound continued to bleed "even after the emergency room."

Glass has worked with Jackson since his surgery in Houston. Glass had observed Jackson doing close-up work before the injury. When asked to compare Jackson's close-up work before and after the injury, Glass stated, "there is a difference . . . you have to be real precise . . . I have worked around him since this accident; and I can see a change in his performability, I guess you could call it, as far as being good. There is a big change."

Lisa Gail Jackson was present when her husband was injured. She knew immediately he had been hurt and needed medical treatment. Lisa went with Billy and Jackson to the hospital and testified when they got there, "they . . . looked at it and everything and didn't know how bad it was because just from the way it looked, there was just a cut there, you know; and it was starting to swell." After some tests were performed, Lisa was told they were going to have to take Jackson to Beaumont. Lisa testified, "[i]t was still pretty bad. Every time—it was draining in his throat, the blood and stuff; and when he would cough, blood would shoot out that hole about a foot. And so, they come in there after he did that a couple of times and wrapped it up. They wrapped it up so the blood wouldn't shoot out every time he would choke. It was pretty bad." Lisa said Jackson was in a lot of pain and was incoherent, "but when he would come to, he would complain about his head was killing him, you know. And then he would kind of go out and in and moaning and groaning, and then he would be out." Jackson was transferred to St. Elizabeth

by ambulance and Lisa accompanied him. Along the way, "[h]e was back there getting choked on the blood and stuff that was in his—coming down in his throat, and throwing up a lot; and he was apologizing because he felt bad about doing it." Jackson was hospitalized for ten days. When Jackson got to the hospital, he was having the same problems he had experienced on the way to the hospital. His eye was still bleeding. Lisa described what life was like for Jackson in the first few days following his accident:

It was real scary is what it was. I mean, he was in a lot of pain, plus scared. I was scared because we didn't know what kind of problems he was going to have, because they didn't know what kind of problems he was going to have. It was just a "if," you know. They really didn't know how much damage it had done right then or what his future problems were going to be because of the air in his brain.

After Jackson was released from St. Elizabeth, he was to have medical treatment in Houston. Once Jackson was home, he was in pain and took a lot of pain pills, "but they didn't work, really. You know, he—he was in a lot of pain." Lisa believed, but was not certain, that Jackson was still having symptoms of pain when he first saw Dr. Patrinely. She was "pretty sure he was because I think Dr. Patrinely gave him some pain pills, too. I'm pretty sure. I know he was experiencing his headaches." According to Lisa, Jackson began complaining of headaches immediately after the accident. Before the injury, he had headaches from time to time, "but nowhere near like now, you know, like it was after the accident." Lisa said Jackson continues to complain of headaches and takes over-the-counter pain medication with him everywhere he goes. He did not do that before the injury. Jackson was

otherwise in good health before the injury, and has been since.

Jackson had surgery at St. Luke's hospital, performed by Dr. Patrinely and Dr. Appling. Jackson required hospitalization for three days for that surgery. Jackson suffered pain following the surgery, "a lot pain, just a whole lot of pain, just around his—pressure. He said he felt like a lot of pressure all the time on his eye, around his eye; just headaches all the time, just a lot of pain, a lot of complaining." After the injury, Jackson was very swollen around the injured area and it was discolored. The swelling and discoloration had decreased before he was operated on in Houston. Following that surgery, it was swollen again and it took awhile for the swelling to go down. Following the injury and when Jackson was admitted to St. Elizabeth, he complained of double vision. Jackson "had to wear a patch on his right eye. He couldn't drive, watch T.V., or anything without it because he saw two of everything." Jackson wore the patch until the surgery in Houston, which cleared up the double vision.

Lisa testified that since the accident, Jackson does not want to have his picture taken because of "that little baggy place and it just don't look good." Lisa said, "they said that fatty tissue or something had settled down there and the fat would be there unless he got another surgery to take it out and remove it. It's just this big wad of fatty tissue like, underneath it." Lisa said it looks different from the other eye, stating "[i]t just looks a lot more baggier looking." Lisa testified Jackson does not want to be in pictures and comments about it nearly every time he looks in the mirror.

Lisa testified they had a pool table and that before the injury Jackson "could beat everybody." Lisa could not beat him but now she can. Lisa said Jackson enjoyed shooting pool before the injury but afterwards lost interest because he was not as good. They sold the pool table. Lisa said Jackson enjoyed hunting before the injury and she went hunting with him. Lisa testified he really looked forward to hunting and enjoyed bow hunting as well as hunting with a gun. Since his injury, "[i]t's all ceased just about . . . He—think he's went a few times, but nothing—nowhere near compared to like he used to be. It used to be the big thing. Now it's one of the minor things." Lisa testified Jackson has not used a bow following his injury. Lisa testified that since the accident, Jackson's steel-toed work boots have to be replaced about every six months because "the whole end of that right toe will be kicked out . . . because of him tripping and hitting his foot on stuff. . . . His left one will be perfect, and his right one will be eat up." Lisa has noticed Jackson "tripping up a lot" and tripping over things, a lot more since he was injured, and said Jackson "complains about it now." Lisa testified they used to go to Lake Rayburn "just about every time we could squeeze it in, you know, on the weekends," but they have only been "maybe once" since the accident. Lisa agreed that since the injury Jackson has not been as active in terms of things he used to like to do.

Ronald Jackson testified when he started bow hunting, he could shoot without a sight. Jackson was proud of his eyesight and thought it was exceptional. He was able to do fine detailed work and never had a problem with his eyes. Jackson had no problem with the lower quadrant of his vision before the injury. Jackson said he "probably stumbled before, but just normal stumbling." He did not scuff his shoes like he does now, and it is just his right boot that gets scuffed.

Jackson said people comment "every day" about his eye looking bad. The sac

under his eye sometimes "has redness in it. It just stays real red sometimes." Jackson said people comment that he looks "hung over" and say "Boy, you pulled one last night." Jackson said he very seldom drinks.

Before the injury, Jackson had no problem with the reaction of his eyes to light and dark. When he wakes up in the morning, he continuously rubs his eye and after a while, about thirty minutes to an hour later, "it will come around pretty good." Jackson said his eye "feels real lazy. It just don't go in hand with the other eye...." When Jackson has to leave for work early in the morning, the headlights of other cars bother his right eye. Jackson said, "It fuzzes. It overexposes the eye, I guess you could say." When he meets a car, he sometimes shuts that eye.

Before the injury, Jackson was doing some torch work, which is physically easier than other pipefitting work. He was getting better at fitting and was working toward being able to get more torch work. Now, he has to start over, and may never get back to where he was. Since the injury, Jackson does not use the torch much anymore and has to do "a lot more strenuous work." Jackson said he does not know how much longer he can do the more physical work. Torch work bothers his eye because the fixed pupil picks up more light than it should, so he does not see as well and cannot do fine cutting. Jackson does not weld, but is around it in his work. The brightness of the welding bothers his eye. "The right eye seems like it burns .... it's real painful ... feel like sand in your eye ... So, I know I'm getting a little bit of an arc burn." When he is called on to do close work, it helps to close his right eye. He does that a lot because

> ... everything fuzzes up. When I've got both of them—that torch puts off

extra light, and that just magnifies my eye. That's why I close it. I pull the lid up, sit there and kind of cools back down and I can see the very tip of my torch and I can get back down to my fine work, my fine cut.

Jackson says his eye aggravates him all day. Jackson said "Normally I get a headache when I try to do some fine work or if I use a torch." Jackson has headaches 90 percent of the time, every day, and takes over-the-counter medication to work. Jackson said he did not have these problems before the injury.

Jackson coached his oldest son in Little League, but has not coached his other two sons. He cannot see as well and cannot hit, throw or catch like before. He does not play catch with the younger two as much as he did with the oldest, and does not try to hit because they make fun of him. Jackson and his wife played co-ed softball before the injury and his wife still occasionally plays. Jackson said he was not that good anymore, has trouble connecting the bat with the ball, and does not want to be embarrassed.

Before the injury, Jackson liked to hunt and shoot pool. Jackson said he was really good at pool and could make some pretty spectacular shots. Jackson has not shot pool since before the accident. Before the injury, Jackson could make tough shots, but now his wife can beat him. Jackson gave up pool because he was not good anymore and lost interest.

At the time of the injury, Jackson realized blood was coming out of his eye. When he coughed, he could taste the blood in his throat. It was making him cough and sick at his stomach. Jackson feared for his life, and was worried about his wife and kids. At the Orange hospital, Jackson was told there was air on the brain which may require brain surgery. It was that concern which led to the transfer to St. Eliza-

beth. It scared him really bad. On the way to St. Elizabeth, Jackson was swallowing blood coming down his sinuses, and it was making him sick. Jackson was having trouble breathing and could not see. One eye was looking one way and the other was looking on the ground. He was very scared and did not know whether it could be fixed. He was in severe pain, and his whole eye was tightly swollen shut. As the swelling decreased, he could open the eye but was seeing double. Jackson thought it was about the fifth day when his eye began to open, which is when he was given the patch. He wore the patch about nine or ten days, while the eye was still out, until he had surgery in Houston. After the surgery, he was in pain until the swelling went down. Jackson was kept on Morphine and Demerol, which pretty well took care of the pain. After he got home, he stayed medicated and "zombied out." After the surgery, both eyes were shut because of the work on the nose. The surgery corrected the double vision and Jackson did not have to wear an eye patch after the surgery. Jackson said he has not been told that glasses could correct his vision but if they could, he would wear them.

Dr. J. Ronald Rowes, an ophthalmologist, testified regarding Jackson's injury. The report of Dr. Mark Kubala, a neurosurgeon, reflected the bar hit the right orbit, resulting in a "blowout" fracture of the orbital floor, fracture of posterior orbit, fracture of the middle wing of sphenoid, fracture involving medial wall of right orbit and right nasal bone and ethmoid sinus. Dr. Kubala also reported right frontotemporal contusion and hemorrhage, pneumocephalus (air in the fractured sinus), periorbital edema and ecchymosis (swelling and blood), laceration of right eyelid, and diplopia (double vision).

Surgery was done to correct deviated nose and septum and hypertrophy of the inferior turbinates (broken nose). The postoperative diagnosis was hypertrophy of the interior turbinates and enlarged right middle turbinate. The operation was described as a submucous resection, nasal resection, partial resection cautery of both interior turbinates and right middle turbinate. Dr. Patrinely did the eye surgery. His preoperative diagnosis was "right orbital fracture, medial wall, floor, with muscle entrapment." The operation was described as right orbital fracture repair and reconstruction using autogenous cartilage and bone graft. Dr. Rowes' examination revealed Jackson's injured eye, the right one, sees 20/25 minus one, and the left sees 20/15 minus one, with "20/20 being the gold standard." Dr. Rowes performed a near vision test which reflected "a little loss on the right eye as compared to the left." Dr. Rowes agreed his near vision was "pretty good." Dr. Rowes tested the central part of Jackson's vision and, while the left eye was normal, he had distortion on the right eye. Dr. Rowes testified "you get 20/20 vision" from central vision. Dr. Rowes performed color and bright light comparison tests, which test optic nerve function, and "they are normal." Dr. Rowes then checked the pupils and found the right pupil was fixed, while the left moved well. Dr. Rowes testified the fixed pupil was most likely due to the blunt trauma the eye suffered at the time of injury. Dr. Rowes did a refraction for glasses, and found Jackson needed no correction in either eye. Dr. Rowes performed a Titmus test and it revealed Jackson's stereoscopic vision "is off a little bit." Jackson's eye revealed R.P.E. (retinal pigment epithelium) changes. Dr. Rowes also ran a visual field, which checks the visual pathways from the front part of the eye all the way back to the brain, in 1991, 1993, and in 1996, two weeks before trial. There

had been no change, which meant the current visual field was a permanent situation. The visual field of Jackson's left eye was normal. The visual field of the injured right eye showed a scotoma, a spot in vision, coming off the optic nerve. According to Dr. Rowes, it showed "damage to the retina, optic nerve area—the back of the eye,...and what you're looking at is a blind spot, inferior medial." Jackson has very little vision in the right lower quadrant, has more difficulty looking down than looking up or straight ahead, has more than half "of vision above." Dr. Rowes agreed Jackson can look up, but has difficulty looking down.

Dr. Patrinely realigned Jackson's eyes. Dr. Rowes measured the alignment of Jackson's eyes and found they are slightly misaligned. He stated:

> You're not going to see it visually on the patient. It's not cosmetic. But it throws the alignments off and it goes along with, No.1, his complaint with— well, his problems with stereoscopical depth perception and it goes along with the fact that he now says that when he uses a cutting torch, he has to close his right eye. I think the visual confusion from the visual field deficit and the misalignment, it's easier for him to use just one eye instead of two.

Jackson has trouble doing detailed work because of these problems. Dr. Rowes testified the fixed pupil causes problems of nearsightedness, blurred vision and glare. Dr. Rowes also said Jackson has a problem with finer depth perception.

Dr. Rowes summarized that Jackson has a visual field problem, a pupil problem, and some misalignment of his eyes. Dr. Rowes said the visual field would not change. Dr. Rowes testified that Dr. Patrinely's chart mentioned headaches in 1993, and Jackson mentioned them to him again in 1996, but said they were less than

before. Dr. Rowes said Jackson was at a higher risk for angle recession glaucoma and cataract formation in his right eye. Dr. Rowes recommended Jackson have a yearly examination for glaucoma but there was no need for any ongoing treatment or medication. Dr. Rowes testified Jackson has "a little infringement on the central vision on the scotoma" but does not wear glasses or contacts, and none have been prescribed.

## STANDARD OF REVIEW

 In reviewing this evidence to determine the sufficiency of the awards for non-economic damages, we employ the new standard set forth by the Texas Supreme Court in *Jackson IV*:

> In this case, Jackson has challenged the factual sufficiency of the jury's failure to award larger damages in the categories of physical pain and mental anguish, physical impairment of loss of vision, and disfigurement, as well as the award of no damages for 'physical impairment other than loss of vision.' The court of appeals should conduct a review of each of these categories, considering the evidence unique to each category. If, after considering evidence unique to a category, the court concludes that the jury's failure to award larger damages for that category is against the great weight and preponderance of the evidence, it should then consider all the overlapping evidence, together with the evidence unique to each other category to determine if the total amount awarded in the overlapping categories is factually sufficient. This takes into account all the evidence regarding damages in categories that overlap, but does not credit that evidence more than once in evaluating the amount awarded by the jury.

*Jackson*, 116 S.W.3d at 773. Stated another way:

When, as in this case, the jury's failure to find greater damages in more than one overlapping category is challenged, the court of appeals should first determine if the evidence unique to each category is factually sufficient. If it is not, the court of appeals should then consider all the overlapping evidence, together with the evidence unique to each category, to determine if the total amount awarded in the overlapping categories is factually sufficient.

*Id.* at 775.

Our first task, therefore, is to assign all the evidence relating to non-economic damages into one or more of the following categories:

* physical pain and mental anguish;
* physical impairment of loss of vision;
* physical impairment other than loss of vision; and
* disfigurement.

## CATEGORIZATION

### Physical Pain and Mental Anguish

The Texas Supreme Court in *Jackson IV* has already determined the evidence of the bone fractures, ruptured sinus, and broken nose to be in the category for physical pain and mental anguish. *Id.* at 771. Further, the court placed the evidence of hospital confinements and loss of enjoyment of life while recuperating in the category of physical pain and mental anguish. *Id.* at 771–73. In this category, we also place the evidence of Jackson's pain, bleeding, nausea and vomiting, the swelling and discoloration, incoherence and fear. The *Jackson IV* court also found evidence of Jackson's headaches to be either within this same category, or the category for physical impairment other than loss of vision. *Id.* at 771.

### Physical Impairment of Loss of Vision

The evidence unique to this category is:

* there is distortion on the central part of Jackson's vision on his right eye;
* Jackson's right pupil is fixed, causing nearsightedness, blurred vision and glare;
* Jackson's stereoscopic vision is off, causing a problem with finer depth perception
* Jackson's right eye has a blind spot, resulting in very little vision in the right lower quadrant of his field of vision and causing difficulty looking down;
* damage to the retina of Jackson's right eye;
* Jackson's eyes are not aligned;
* Jackson is at a higher risk for angle recession glaucoma and cataract formation in his right eye;
* Jackson's ability to perform close-up work is diminished, therefore he has to do more of the manual work in pipefitting;
* Jackson's right eye is easily burned by welding;
* Jackson's double vision before the surgery;
* Jackson's stumbling and tripping; and
* Jackson's trouble driving when oncoming cars have turned on their headlights.

In this category, as well as that of physical impairment other than loss of vision, is the evidence relating to loss of enjoyment of life. The Texas Supreme Court in *Jackson IV* noted that "loss of enjoyment of life fits best among the factors a factfinder may consider in assessing damages for physical impairment." *Id.* at 772. The Court went on to observe that "if other elements such as pain, suffering, mental anguish, and disfigurement are submitted, there is little left for which to compensate under the category of physical impairment other than loss of enjoyment of life." *Id.*

Since those other elements were submitted in this case, we are clearly instructed to place evidence relating to loss of enjoyment of life in the category of physical impairment. The evidence reflects that because he cannot see as well, Jackson no longer enjoys shooting pool, hunting, softball, or playing ball with his two younger sons, and has only been to Lake Rayburn once since the injury.

### Physical Impairment Other than Loss of Vision

As noted above, the Supreme Court of Texas found Jackson's headaches could be placed in this category, as well as the category for physical pain and mental anguish. *Id.* at 771. Also noted above is that the Court found evidence of loss of enjoyment of life belongs in the category of physical impairment. *Id.* at 772. Thus, also in this category is the evidence that Jackson no longer enjoys shooting pool, hunting, softball, or playing ball with his two younger sons, and has only been to Lake Rayburn once since the injury. These, however, must also be placed within the category of physical impairment of loss of vision, since Jackson testified he does not enjoy his former activities because he cannot see as well. Accordingly, there is no evidence that is unique to this category.

### Disfigurement

In the category of disfigurement is the evidence that there is a baggy area under Jackson's right eye that, on occasion, has redness in it, which leads others to believe he has been drinking too much, when, in fact, he drinks very little.

### ANALYSIS

As this court has noted in the past, physical damage awards such as physical pain, mental anguish, physical impairment, and disfigurement are necessarily specula-

tive and particularly within the jury's province to resolve. *See Missouri Pacific R. Co. v. Roberson,* 25 S.W.3d 251, 259 (Tex.App.-Beaumont 2000, no pet.) (citing *White v. Sullins,* 917 S.W.2d 158, 162 (Tex. App.-Beaumont 1996, writ denied)). In assessing personal injury damages, the jury has wide latitude in determining the amount of the award. *See Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 268 (Tex.App.-Beaumont 1987, no writ). Considering the evidence unique to each category, we are unable to conclude the jury's failure to award larger damages for any of the four categories is against the great weight and preponderance of the evidence. Accordingly, issues one through five are overruled and the judgment of the trial court is AFFIRMED.